UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE DUCH,

      Plaintiff,

v.                                  Case No. 09-15045
                                   Honorable Patrick J. Duggan

MICHIGAN DEPARTMENT OF
CORRECTIONS, MARILYNNE
YOUNG, and CHERYL BRAXTON,

      Defendants.
_____/

## OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on February 15, 2011.

PRESENT:   THE HONORABLE PATRICK J. DUGGAN
                   U.S. DISTRICT COURT JUDGE

Plaintiff Catherine Duch filed this action against Defendants on December 30, 2009, after she was terminated from her position as a parole agent with the Michigan Department of Corrections ("MDOC"). Defendants are the MDOC, MDOC former Supervisor Marilynne Young ("Young"),[1] and MDOC Area Manager Cheryl Braxton ("Braxton") (collectively "Defendants"). Presently before the Court is Defendants' motion for summary judgment filed pursuant to Federal Rule of Civil Procedure 56 on

_____

[1]Young is often referred in documents as Marilynne Kelso and that in fact was her name on the date of her deposition in this case.

October 15, 2010.  Plaintiff filed a response to the motion on December 20, 2010.[2]  This Court held a motion hearing on February 10, 2011.  Because Plaintiff presents genuine issues of material fact to support her claims, the Court denies Defendants' motion.

## I.      Standard for Summary Judgment

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c).  The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986).  After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact."  *Id.* at 323, 106 S. Ct. at 2553.  Once the movant meets this burden, the "nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587,

---

[2]Pursuant to the parties' stipulations, the Court granted Plaintiff until December 20, 2010 to file her response.  (Docs. 28, 29.)

106 S. Ct. 1348, 1356 (1986) (quoting Fed. R. Civ. P. 56(e)). To demonstrate a genuine

issue, the nonmoving party must present sufficient evidence upon which a jury could

reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*,

477 U.S. at 252, 106 S. Ct. at 2512.  The court must accept as true the non-movant's

evidence and draw "all justifiable inferences" in the non-movant's favor. *See id.* at 255,

106 S. Ct. at 2513.

## II.    Factual and Procedural Background

On January 2, 2008, MDOC hired Plaintiff, a Caucasian, Lebanese female, to

serve as a parole agent in its Pontiac Parole Office.  Plaintiff was interviewed by two

panels prior to being hired; neither panel included individuals who subsequently

supervised Plaintiff or made decisions ultimately resulting in her termination.  As a new

hire, Plaintiff was subject to a one-year probationary period, with three-, six, and twelve-

month performance evaluations.

Plaintiff underwent training when she first began her employment.  During most of

her training, she was not assigned a full caseload; however, she obtained a full caseload

by the end of February 2008.  (Pl.'s Resp. Ex. 1 at 28.)  Grover Croom ("Croom") served

as Plaintiff's supervisor early in her employment.  Croom conducted Plaintiff's three-

month evaluation on April 18, 2008, rating her "meets" or "exceeds" expectations in all

areas.  (*Id*. Ex. 4.)  Croom noted *inter alia* that Plaintiff "maintained good OMNI notes,"

"record[s] significant dates in a parolee's supervision," "[a]s a new agent . . . is learning

very well to apply Departmental policies and procedures," and that her

3

"[r]ecommendations are consistent with public safety."  (*Id.*)

Young replaced Croom as the supervisor of the Pontiac Parole Office on April 21, 2008, when Croom was assigned to a different office.  Young is an African-American female.  Plaintiff alleges that soon after Young arrived at the Pontiac Parole Office, she waged a campaign of harassment and false allegations of poor performance to get rid of Plaintiff.

According to Plaintiff, shortly after arriving, Young told Plaintiff that she is "rude, crude, anti-social.  She did not like [Plaintiff].  She did not like how [Plaintiff] looked.  And she did not like how [Plaintiff] dressed."  (Pl.'s Resp. Ex. 1 at 33-34.)  On another occasion, Young walked into Plaintiff's office and commented, in the presence of another agent, "oh, I guess God don't like ugly."  (*Id.* at 37.)  Plaintiff claims that the other agent, who is African-American, told Plaintiff: "that's what we say against white people."  (*Id.* at 38.)  Plaintiff contends that Young also gave her "dirty looks," threw files on Plaintiff's desk, and slammed Plaintiff's office door.  (*Id.* at 57.)

Apparently Young treated all of the agents in the Pontiac Parole Office badly; although Plaintiff believes that she was treated the worst.  (*Id.* at 35.)  In fact, although she was the only supervisor in the Pontiac Parole Office, Young refused to train Plaintiff specifically and told Plaintiff not to come to her with questions because she "could not deal with [Plaintiff]."  (*Id.* at 33, 40.)

On June 24, 2008, Plaintiff's union filed a grievance on her behalf complaining that Plaintiff was "being harassed, is the target of personal attacks and disparity in

4

treatment, all due to her race." (Pl.'s Resp. Ex. 5.) Notice of the grievance was sent by email to Young. (*Id*.) At the same time, Young was preparing Plaintiff's six-month evaluation. (*Id*. Ex. 6.) Initially, Young gave Plaintiff "unsatisfactory" ratings on the review. (*Id*. Ex. 8.) However MDOC Deputy Regional Administrator Michael Alexander found insufficient examples to support the ratings and thus Young subsequently changed the review to "meets expectations" (i.e. satisfactory). (*Id*.; Ex. 7 at 61-62; Ex. 3 at 68-70; Ex. 9.) One example of alleged misconduct that Young did provide on her initial review was Plaintiff's alleged failure on June 23, 2008, to follow Young's instructions on three occasions to remove a parole detainer. (*Id*. Ex. 8.)

On July 28, 2008, Plaintiff had a run-in with fellow parole agent Adrian Albert. (*Id*. Ex. 10.) On that date, Plaintiff scheduled a male parolee for urine testing but the urine technician was out of the office. (*Id*.) Young instructed Plaintiff to ask Albert for assistance in obtaining a urine sample from the parolee. (*Id*.) When Plaintiff did so, Albert became irate (*Id*.) Two days later, Plaintiff approached Albert regarding the incident and he yelled at her: "Get out of my face, I am not talking to you." (*Id*.) Plaintiff claimed that Albert was very loud and stated: "If you don't move out of my office I will move you myself." (*Id*.) Plaintiff raised the incident with Young, who she claims did nothing.

Plaintiff reported the incident to MDOC Harassment Counselor Carolynn Wilson. Plaintiff specifically told Wilson that Young created a hostile environment for Plaintiff that allowed her co-workers to treat her unprofessionally and that she believed the

hostility is due to her race and gender.  (*Id*. Ex. 10.)  Wilson sent Plaintiff's complaint to MDOC Regional Manager Dinah Moore.  In a September 5, 2008 memorandum, Moore charged investigator Helen Pettiford with investigating Plaintiff's allegations against Albert, only.  (*Id*. Ex. 14.)  Young subsequently approached Plaintiff and expressed dissatisfaction that Plaintiff "went behind [her] back" and filed the complaint.  (*Id*. Ex. 1 at 79.)

Around the same time, anonymous letters were being sent to MDOC Director Patricia Caruso, the Governor, and other individuals, that raised complaints about Young's treatment of the Pontiac Parole Office staff.  (Defs.' Mot. Exs. 23-25.)  All of the letters were represented as being from "the Staff of the Pontiac Parole Office."  (*Id*.) Plaintiff acknowledged during her deposition in this matter that she sent two of the letters (Exhibits 24 and 25); Plaintiff denied writing or having previously seen the other letter. (Pl.'s Resp. Ex. 1 at 82, 146-47.)

In Plaintiff's letters addressed to Caruso and the Governor, she asserted that Young was "creating a very hostile and harassing work environment within" the office. (*See, e.g., id*. Ex. 24.)  Plaintiff's first letter was received in Caruso's office on September 8 or 9, 2008.  (*Id*.)  This letter describes Young's harassment of various agents but states that Young "especially picks on the white agents."  (*Id*.)  Plaintiff also indicated that complaints about Young had been made to Braxton and Moore but had fallen on deaf years.  (*Id*.)  According to Plaintiff, "Young has made it known that she is friends with . . . Braxton and . . . Moore" and that "she is in good with [them] . . . and nothing is going to

6

be done." (*Id.*)

Based on Plaintiff's comments regarding Young that were included in Wilson's report and the anonymous letters complaining of Young's behavior, Pettiford also looked into Young's conduct when she investigated the incident between Plaintiff and Albert. (Defs.' Mot. Ex. 5 at 10.) Pettiford submitted written questions to Plaintiff and her co-workers as part of her investigation. In response to whether Plaintiff believed her relationship with Young had anything to do with her race or gender, Plaintiff responded:

> My relationship with Supervisor Young has not been based on professionalism. I do not know if this has anything to do with my race or gender. This is a hard call for me to make. Although, I do know she has treated me badly and differently in the way she has spoken to me in a direct tone whereas she does not speak to the other agents in this office that way.

(Defs.' Mot. Ex. 14.)

On September 5, 2008, Young was moved from the Pontiac Parole Office to the Pontiac Probation Office, although she retained supervisory authority over the Pontiac Parole Office staff. (Pl.'s Resp. Ex. 2 at 37-38, 42-43; Ex. 3 at 24, 29, 31.) Michelle Anderson and then Braxton briefly took over as the on-site supervisor for the staff. However, in October 2008, Braxton instructed Young that she was to "run the [Pontiac Parole Office] as if [she] was there." (*Id.* Ex. 30.)

On December 3, 2008, Plaintiff faxed a detainer removal to the Oakland County jail to release a parolee, Anita Palacious. On September 25, 2008, Anderson had verbally instructed Plaintiff that once Palacious served her sentence, Plaintiff could release her and reinstate her back on parole. (Pl.'s Resp. Ex. 1 at 120-126.) A 226 form or "blue sheet"

should have been prepared and submitted before this occurred, however, and one only was submitted five days after Palacious' release. The blue sheet recommended reinstatement of parole with a tether for 90-days. Thus Palacious was released without electronic monitoring five days before the 226 form was approved.

By December 4, 2008, Young became aware that Plaintiff had caused Palacious' release without a 226 form the previous day. Young therefore emailed Plaintiff that day, asking who gave Plaintiff permission to release Palacious. (Pl.'s Resp. Ex. 23.) In response, Plaintiff informed Young of Anderson's earlier instruction and explained that this led her to remove Palacious' detainer. (*Id.*). Four days later, on December 8, Young emailed Parole Violations Specialist Ebony Pullins-Govantes that Palacious had been released by Plaintiff before a 226 form was approved and a tether was immediately put into place. (*Id*. Ex. 24.) On the same date, Young sent an email to Moore recommending that Plaintiff's release of Palacious on December 3 should "be investigated further." (*Id*. Ex. 25.)

On December 26, 2008, Braxton sent Plaintiff a Disciplinary Conference Notice "based on an overall '[u]nsatisfactory' probationary performance rating." (Pl.'s Resp. Ex. 28.) Braxton's recently completed one-year review of Plaintiff brought about the conference. (*Id*.) Up to this point, Braxton had not informed Plaintiff that she was doing a poor job. (*Id*. Ex. 1 at 94.) Braxton based her review on Young's six-month evaluation of Plaintiff and discussions with Young regarding Plaintiff's performance. (*Id*. Ex. 17 at 107.)

8

Braxton's comments on Plaintiff's one-year review are similar to those made by Young on Plaintiff's six-month evaluation in that most negative comments relate to subjective requirements– i.e., Plaintiff's ability to "build[] strategic working relationships" and "trust"; her "contribut[ion] to team success"; and her failure to communicate with co-workers. (*See* Pl's Resp. Exs. 9, 19.) The examples Braxton provides to support her unsatisfactory ratings are Plaintiff's alleged lack of knowledge with regard to how to schedule offender urine tests and detainer removals. (*Id*. Ex. 19.) The former criticism was based on Plaintiff's interaction with Albert when she scheduled a parolee's urine test when the urine technician was off-duty and the latter apparently was based on Plaintiff's release of Palacious. (*Id*. Ex. 7 at 107-13.) Otherwise, Braxton indicated that Plaintiff satisfactorily performed the job's performance factors/objectives. (*Id*. Ex. 19.) For example, Braxton indicated that Plaintiff, *inter alia*: "prepares and completes reports"; maintains required offender supervision standards"; "maintains information on OMNI case notes"; and "maintains and documents appropriate supervision levels for all offenders." (*Id*.)

Plaintiff submitted a rebuttal to Braxton's evaluation. (Defs.' Mot. Ex. 17.) Plaintiff, her union representative, and Braxton participated in a Disciplinary Conference on January 12, 2009. On the same date, Carolynn Wilson took over as the supervisor of the Pontiac Parole Office. Based on the unsatisfactory review, Braxton eventually recommended extending Plaintiff's probationary period for three months to give Plaintiff a chance to improve. (*Id*. Ex. 2 at 22.) Nobody thereafter conveyed to Wilson, by then

9

Plaintiff's supervisor, the areas where Plaintiff needed further training or inquired about Plaintiff's performance.  (Pl.'s Resp. Ex. 7 at 24; Ex. 2 at 74.)

On January 23, 2009, Plaintiff received a second Disciplinary Conference Notice, this one related to her release of Palacious.  (Pl.'s Resp. Ex. 28.)  Braxton conducted the hearing which was held on February 3, 2009.  In the meantime, on or about January 23, 2009, Braxton completed a performance review of Plaintiff for the period covering her extended probation.  (*Id*. Ex. 33.)  In this review, Braxton rated Plaintiff "unsatisfactory" with respect to several criteria.  (*Id*.)

In support of her unsatisfactory ratings of Plaintiff, Braxton referred to Plaintiff's scheduling of urine tests while the urine technician was off-duty, her relationship with co-workers, and the Palacious release.  (*Id*.)  Although Plaintiff was working under Wilson's supervision during the extended period of her probation, Braxton did not seek Wilson's comments regarding Plaintiff's performance when she prepared her performance review.

Wilson in fact had emailed Plaintiff on February 9, 2009, indicating that she would like to do a 30-day performance review of Plaintiff the following day.  (Pl.'s Resp. Ex. 31.)  Wilson recalled during her deposition in this matter that when she met with Plaintiff on February 10, she told Plaintiff that she "was satisfied with the way things were going, [and] that we would continue on."  (*Id*. Ex. 12 at 38.)  At this time, Wilson prepared a 30-day evaluation of Plaintiff which contained "nothing negative."  (*Id*. at 39.)  Wilson testified that she rated Plaintiff as "meet[s] expectations" in the areas that Braxton rated her as "unsatisfactory" on the latter's final performance review.  (*Id*. at 51-53.)

10

According to Wilson, she sent Plaintiff's review to Braxton for approval but Braxton never gave it back.  (*Id*. at 38-39.)

In the meantime, Braxton prepared summaries of Plaintiff's January 12 and February 3, 2009 Disciplinary Hearings which she sent to Moore.  (Pl.'s Mot. Ex. 28.)  In her summaries, Braxton also informed Moore of Plaintiff's unsatisfactory ratings on her most recent performance review.  (*Id*.)  Braxton failed to mention Wilson's performance review of Plaintiff, even though Wilson was Plaintiff's supervisor during the extended period of her probation.  (*Id*.)  On February 11, 2009, relying on Braxton's reports, Moore recommended Plaintiff for termination.  (Pl.'s Resp. Ex. 2 at 75, 77; Ex. 32.)  Moore's supervisor, Kathy Warner accepted the recommendation on February 24, 2009.  (*Id*. Ex. 32.)

On March 2, 2009, Plaintiff received notice that a third Disciplinary Conference was scheduled for March 4 to consider her unsatisfactory performance ratings.  (Pl.'s Resp. Ex. 28.)  Plaintiff was suspended pending the March 6 Disciplinary Conference. On March 2, Plaintiff's union filed a grievance on her behalf and requested a step one hearing with Wilson.  (Pl.'s Resp. Ex. 5.)  Wilson replied on the same date, indicating the days she was available during the current and following weeks; however, Braxton subsequently instructed Wilson not to do the hearing.  (*Id*.; Ex. 12 at 66-67.)  On the morning of the March 6 Disciplinary Conference, Plaintiff's union representative emailed Braxton and informed her that Plaintiff was on an approved medical/sick leave under the federal Family Medical Leave Act and requested that the conference be postponed

11

indefinitely.  (*Id.*)  Concluding that Plaintiff was not eligible for leave under the FMLA as a probationary employee, Braxton appeared at the conference as scheduled.  (*Id.*)

On or around March 6, 2009, the MDOC terminated Plaintiff's employment and she was replaced by L'Tanya Washington, an African American parole agent.  (Pl.'s Resp. Ex. 12 at 27-28.)  On December 30, 2009, Plaintiff filed the present lawsuit in which she alleges that Defendants' discipline and ultimate termination of her employment constituted harassment and race, gender, and/or national origin discrimination.  In her Complaint, Plaintiff asserts the following claims:

(I) race discrimination in violation of Title VII against MDOC;

(II) national origin discrimination in violation of Title VII against MDOC;

(III) sex discrimination in violation of Title VII against MDOC;

(IV) retaliation in violation of Title VII against MDOC;

(V) race discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA") against all Defendants;

(VI) national origin discrimination in violation of the ELCRA against all Defendants;

(VII) sex discrimination in violation of the ELCRA against all Defendants;

(VIII) retaliation in violation of the ELCRA against all Defendants;

(IX) deprivation of Plaintiff's rights to equal protection on account of her race, brought pursuant to 42 U.S.C. § 1983 against all Defendants;

(X) deprivation of Plaintiff's rights to equal protection on account of her national origin, brought pursuant to § 1983 against all Defendants;

(XI) deprivation of Plaintiff's rights to equal protection on account of her

sex, brought pursuant to § 1983 against all Defendants;

(XII) deprivation of Plaintiff's freedom of speech [i.e., retaliation for engaging in constitutionally protected speech], brought pursuant to § 1983 against all Defendants;

(XIII) denial of Plaintiff's Due Process Rights in violation of § 1983 against all Defendant; and

(XIV) race discrimination in violation of 42 U.S.C. § 1981 against all Defendants.

Pursuant to the parties' stipulation, Plaintiff's claims against MDOC in Counts V-XIV were dismissed on April 20, 2010.

13

### III.   Applicable Law and Analysis

### A.   Plaintiff's Discrimination Claims

Defendants seek summary judgment with respect to Plaintiff's race, gender, and national origin based discrimination claims asserted under Title VII, §§ 1981 and 1983, and the ELCRA, arguing that Plaintiff lacks direct or circumstantial evidence of discrimination.  All of these claims are analyzed using the same general standards. *Sutherland v. Mich. Dep't of Treasury*, 344 F.3d 603, 614 and n. 4 (6th Cir. 2003).

Absent direct evidence of discrimination, courts apply the burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817 (1973).  *Sutherland*, 344 F.3d at 614.   First, the plaintiff must establish a *prima facie* case of discrimination by showing that: "(1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) she was replaced by someone outside the protected class or was treated differently than similarly-situated, non-protected employees."  *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir. 2006) (citing *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir.2004)).  To satisfy the first prong in a case where a member of the majority is claiming discrimination on the basis of race in violation of federal law, "the plaintiff must 'demonstrate background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority.'" *Sutherland*, 344 F.3d at 614 (quoting *Zambetti v. Cuyahoga Cmty. Coll.*, 314 F.3d 249, 255 (6th Cir.2002) (additional quotation marks and citation omitted)).  The same plaintiff alleging race discrimination

14

under Michigan's ELCRA, however, need not satisfy this arguably heightened standard of proof.  *Lind v. City of Battle Creek*, 470 Mich. 230, 681 N.W.2d 334 (2004) (holding that under Michigan's statute, a reverse discrimination claim does not require a showing of "background circumstances supporting the suspicion that the defendant is that unusual employer who discriminates against the majority.")

If the plaintiff satisfies her burden, the employer must demonstrate a legitimate, non-discriminatory reason for the adverse employment action.  *Sutherland*, 344 F.3d at 614-15.  If the employer presents such proof, to succeed on her claim the plaintiff must demonstrate that the proffered reason is a pretext for discrimination.  *Id.* at 615. There are three ways the plaintiff can make this showing: demonstrating that (1) the stated reason has no basis in fact, (2) did not actually motivate the employer's action, or (3) was insufficient to motivate the action.  *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds* in *Geiger v. Tower Auto.*, 579 F.3d 614 (6th Cir. 2009).

Although the plaintiff must come forward with evidence to show that the defendant's reason for the employment action is false, she need not present independent evidence that the proffered reason is a pretext for racial discrimination.  *Sutherland*, 344 F.3d at 615. "[A] plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000).  In other words: "It is *permissible* for

15

the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation. . . . Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive." *Id*. at 147, 120 S. Ct. at 2108 (emphasis in original) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 517, 113 S. Ct. 2742 (1993)).

Defendants argue that Plaintiff cannot demonstrate a *prima facie* case of retaliation because she is not able to show that similarly situated, non-protected employees engaged in the same conduct as Plaintiff and were treated differently. Specifically, Defendants argue that, like Plaintiff, numerous probationary employees were terminated for unsatisfactory performance and work rule violations. (Defs.' Br. in Supp. of Mot. at 11.)

Defendants also urge the Court to find a strong presumption against discrimination in this case based on the "same actor inference." (*Id*.) As the Sixth Circuit has explained: "'[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for adverse action taken by the employer.'" *Zambetti*, 314 F.3d at 261 (quoting *Buhrmaster v. Overnite Trans. Co.*, 61 F.3d 461, 463 (6th Cir.1995)). With respect to Plaintiff's claims that she suffered discrimination because she is Caucasian, Defendants further argue that she cannot show "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority." *Sutherland*, *supra*.

16

Even if Plaintiff succeeds in establishing a *prima facie* case of discrimination, Defendants contend that she cannot show that the reasons for her termination (i.e., violation of work rules and her unsatisfactory performance) were pretextual. Defendants argue that an independent investigator and decisionmaker found that Plaintiff violated work rules and that statements by Plaintiff's co-workers support the unsatisfactory ratings on her performance review. Defendants further argue that Plaintiff could have been terminated solely because of her unsatisfactory performance during her probationary period; however, "[they] chose to give Plaintiff a chance to succeed." (Defs.' Br. in Supp. of Mot. at 12.) "It was only after [Plaintiff's] rule violations were proven that she was terminated." (*Id.*) Additionally, Defendants contend that their recorded treatment of probationary employees who violated work rules demonstrates that the reason for Plaintiff's termination was sufficient to motivate their action. Braxton and Young, Defendants lastly argue, did not make the decision to terminate Plaintiff; Warner was the final decisionmaker.

As Plaintiff counters, Defendants improperly import their proffered non-discriminatory reason into the *prima facie* case when they frame the issue as whether other probationary employees who violated work rules were terminated. *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 574 (6th Cir. 2003). The Sixth Circuit instructed in *Wexler*: "[A] court may not consider the employer's alleged nondiscriminatory reason for taking an adverse employment action when analyzing the prima facie case. To do so would bypass the burden-shifting analysis and deprive the

plaintiff of the opportunity to show that the nondiscriminatory reason was in actuality a pretext designed to mask discrimination." *Id.* at 574 (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660-61 (6th Cir. 2000) ("[W]hen assessing whether a plaintiff has met her employer's legitimate expectations at the prima facie stage of a termination case, a court must examine [the] plaintiff's evidence independent of the nondiscriminatory reason 'produced' by the defense as its reason for terminating plaintiff.")) Following this guidance, the Court finds a genuine issue of material fact relevant to Plaintiff's ability to establish her *prima facie* case of race, gender, and/or national origin discrimination.

Setting Defendants' proffered reasons for Plaintiff's termination aside, there can be no dispute that she was a member of a protected class, suffered an adverse employment action, and was qualified for the position. As to the fourth prong of her *prima facie* case, Plaintiff presents evidence to support a finding that she was replaced by someone outside the protected class and was treated differently than similarly-situated, non-protected employees.

In her brief in response to Defendants' motion, Plaintiff identifies three parole agents outside the protected class who failed to comply with MDOC's standards for release and supervision of parolees:

> •African-American female Antoinette Hughes who failed to properly obtain a warrant, leaving an absconder unsupervised in the community; (Pl.'s Resp. Ex. 11)

> •White male Mike Perriloux who released a sex offender parolee into the community without proper monitoring conditions, resulting in the inability to prosecute the individual for parole violations and his release; (*Id.* Ex. 26;

18

Ex. 7 at 93)

•African-American female Ava Roby who supervised eight sex offender
parolees who were not in compliance with electronic monitoring
requirements and were untethered. (*Id*. Ex. 26; Ex. 18; Ex. 7 at 146-47.)

Additionally Young, who was a probationary employee, received unsatisfactory ratings

from Braxton due in part to her failure to detect and properly supervise the agents with

respect to the above infractions. (*Id*. Ex. 26.) Despite the fact that the above-described

conduct created safety issues similar to those created by Plaintiff's release of Palacious

without a 226 form, there is no evidence that any of these agents or Young were

investigated for or terminated because of the violations. (*Id*. Exs. 18, 26.)

In light of the above evidence, the Court finds a genuine issue of material fact with

respect to Plaintiff's ability to demonstrate a *prima facie* case of discrimination based on

her gender and national origin. Because Plaintiff's reverse race discrimination claim

under the ELCRA does not require additional proof, *see supra*, the Court also finds that

Plaintiff establishes genuine issue of material fact with respect to her *prima facie* case of

race discrimination under that statute. The Court refuses to find a strong presumption

against discrimination based on the "same actor inference," as Defendants advocates,

because there is no evidence that the same *individuals* who hired Plaintiff also were

involved in the decisions leading to her termination. *See Zambetti*, *supra*.

With respect to Plaintiff's discrimination claims under federal law, the Court also

concludes that a genuine issue of material fact exists regarding Plaintiff's ability to

present a *prima facie* case of reverse race discrimination because she presents sufficient

19

evidence to satisfy the "background circumstances" requirement.  The persons who took actions resulting in Plaintiff's termination (Young, Braxton, and Moore) are all African-American.  "Recent Sixth Circuit precedent suggests, in the context of reverse discrimination claims, that the mere fact that an adverse employment decision was made by a member of a racial minority is sufficient to establish the ['background circumstances' requirement]." *Arendale v. City of Memphis*, 519 F.3d 587, 603 (6th Cir. 2008) (citing *Zambetti*, 341 F.3d at 257). Although Warner made the final disciplinary decisions, she did so based on the reports and recommendations supplied by the other individuals. *See Cobbins v. Tenn. DOT*, 566 F.3d 582, 587 (6th Cir. 2009) (citing *EEOC v. BCI Coca-Cola Bottling Co.*, 450 F.3d 476, 484 (10th Cir. 2006) (explaining the "cat's paw" theory of liability which "refers to a situation in which a biased subordinate, who lacks decisionmaking power, influences the unbiased decisionmaker to make an adverse hiring decision . . ..")) 

While Defendants argue that Plaintiff was terminated for legitimate, non-discriminatory reasons (i.e., she received an unsatisfactory performance rating during her probationary period and released Palacious without proper authorization), Plaintiff presents sufficient evidence to create a genuine issue of material fact with respect to whether these reasons were a pretext for discrimination.  Young completed Plaintiff's performance evaluation at her six-month review.  Young first rated Plaintiff's performance as "unsatisfactory" but had to change her ratings after being informed that she lacked sufficient supporting information. There also is evidence suggesting that

20

Young treated the only two white females under her supervision (Plaintiff and agent Angela Chatman) to disparate treatment.  (*See, e.g.*, Pl.'s Resp. Ex. 1 at 33-35, 37, 55, 57; Exs. 11, 18.)

Braxton relied on the reviews prepared by Young and sought Young's input to complete Plaintiff's one-year review.  (*Id*. Ex. 7 at 22-23, 107, 109-11.)  To justify her "unsatisfactory" ratings of Plaintiff, Braxton relied heavily on Plaintiff's scheduling of urine tests while the urine technician was off-duty (an incident that occurred while Young was supervising Plaintiff).  However there is evidence that other agents in the Pontiac Parole Office scheduled urine tests on the same day and that Young was criticized for not training the agents under her supervision properly regarding the scheduling of urine tests when the technician was off-duty.

Braxton also criticized Plaintiff for such things as being resistant to change, reluctant to communicate, and for isolating herself from her co-workers.  (Pl.'s Resp. Ex. 19.)  There is evidence suggesting that Plaintiff's relationship with her co-workers was affected by Young's hostility towards and harassment of Plaintiff.  (*See id.* Ex. 10.)  Notably, Croom did not find the same deficiencies regarding Plaintiff when he completed her first performance review.  (*Id*. Ex. 4.)  Moreover, such subjective criticisms are generally scrutinized closely.  As the Sixth Circuit has provided:

> This court has previously discussed the problems with entirely subjective selection procedures in which the decisionmakers are nonmembers of the plaintiff's protected group. *See Rowe v. Cleveland Pneumatic Co.*, 690 F.2d 88, 93 (6th Cir.1982) (per curiam). While it is true that such subjective procedures do not violate Title VII *per se*, *Grano [v. Dep't of*

21

>*Development*], 699 F.2d [836] at 837 [6th Cir. 1983], "they do provide a
>ready mechanism for discrimination, permitting . . . prejudice to affect and
>often control promotion and hiring decisions." *Rowe*, 690 F.2d at 93.
>Therefore, where the decisionmakers are nonmembers of plaintiff's
>protected group, "the legitimacy of the articulated subjective reason for the
>employment decision is subject to particularly close scrutiny . . .." *Grano*,
>699 F.2d at 837; *see also Rowe*, 690 F.2d at 93 ("While we recognize that,
>in some circumstances, employment decisions may be made on the basis of
>such subjective criteria, any procedure employing such subjective
>evaluations will be carefully scrutinized in order to prevent abuse.").

*Childs v. Green Local Sch. Dist.*, No. 86-3011, 1986 WL 217546, at * (6th Cir. 1986).

Moreover, Braxton gave Plaintiff unsatisfactory ratings on the performance review

completed during the extension of her probationary period despite the fact that the

individual actually supervising Plaintiff at this time, Wilson, believed that Plaintiff was

meeting expectations and that Braxton lacked any recent instances of misconduct by

Plaintiff (i.e. after her last review) to justify the ratings. Instead, Braxton continued to

base her unsatisfactory ratings of Plaintiff on the July 28, 2008 urine testing incident and

Plaintiff's release of Palacious in early December 2008. For this reason, a trier of fact

may find it difficult to believe Defendants' claim that they extended Plaintiff's

probationary period because they wanted to give her a chance to succeed. (Defs.' Br. in

Supp. of Mot. at 12.)

With respect to Plaintiff's release of Palacious, the Court already has discussed

why there is a question of fact as to whether this conduct justified her termination. The

Court additionally notes that Sandra Wilson, who investigated the incident, did not find

that Plaintiff violated work rules; rather, she only found that Plaintiff "may have" violated

22

those rules. (Defs.' Mot. Ex. 3 at 43; Ex. 20.)  Wilson explained during her deposition in this case that her report gets reviewed by Braxton who does a final report that is sent to the regional manager, Moore.  (*Id*. Ex. 3 at 43-44.)  Braxton also testified that it actually is the supervisor of the parole office who ultimately is responsible for ensuring that prisoners are released in compliance with guidelines. (Pl.'s Resp. Ex. 7 at 145.) Nevertheless, Young was not investigated or disciplined with respect to Palacious' release, even though she knew of the release without a 226 form the day after it happened but took no action to correct the error until several days later.

Finally, Plaintiff claimed that she released Palacious on the instruction of interim supervisor Anderson and therefore assumed that Anderson already had obtained the 226 form.  (*Id*. Ex. 1 at 126; Ex. 23.)  As Plaintiff points out, Young rated Plaintiff "unsatisfactory" on her proposed six-month review when Plaintiff failed to follow Young's instructions to remove a parole detainer. (*See id*. Ex. 8).  Pontiac Parole Office agent Tom Lane states in an affidavit submitted in support of Plaintiff's response that he was investigated and disciplined for refusing to release a prisoner without the 226 form when his supervisor instructed him to do so.  (*Id*. Ex. 11.)

In summary, Plaintiff presents sufficient evidence to raise a question of fact with respect to whether Defendants' proffered reason for terminating her was a pretext for discrimination.  The Court therefore finds that Defendants are not entitled to summary judgment with respect to Plaintiffs' race, gender, and national origin discrimination claims brought pursuant to §§ 1981 and 1983, Title VII, and the ELCRA.

23

B.       **Plaintiff's Retaliation and Free Speech Claims**

Defendants seek summary judgment with respect to Plaintiff's retaliation claims brought pursuant to § 1983, Title VII, and the ELCRA and her First Amendment retaliation claim brought pursuant to § 1983.  These claims are analyzing under the same framework as Plaintiff's discrimination claims.  First, Plaintiff must establish a *prima facie* case of retaliation by showing that: (1) she engaged in protected activity; (2) of which Defendants were aware; (3) Defendants subjected Plaintiff to an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action.  *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citations omitted).  If Plaintiff succeeds in proving the existence of a *prima facie* case, Defendants must come forward with a legitimate, non-discriminatory reason for the adverse action.  *Id*.  To prevail, Plaintiff then must demonstrate that the proffered reason was a mere pretext for retaliation.  *Id*.

Defendants do not challenge the first element of Plaintiff's *prima facie* case.  Plaintiff in fact engaged in protected conduct in that she filed grievances with respect to her treatment in the workplace, including Albert's response to her request for assistance conducting urine tests, Young's response to her complaints regarding Albert's conduct, her unsatisfactory performance reviews, and termination.  (*See* Pl.'s Resp. Ex. 5.)  Plaintiff also sent letters to the Governor and the MDOC Director to complain about Young's harassment of the employees under her supervision.  (Defs.' Mot. Exs. 24, 25.)

Defendants do challenge Plaintiff's ability to establish the fourth prong of her

24

*prima facie* case, that being a causal connection between any complaints of discrimination and her termination.  Defendants argue that there is no evidence that the ultimate decision maker, Kathy Warner, was aware of Plaintiff's complaints.  Further, Defendants contend that Plaintiff's complaints about Albert were investigated and prompt remedial action was provided.  Defendants lastly argue that even if Plaintiff could establish a *prima facie* case of retaliation, her claims fail because there was a legitimate, non-retaliatory reason for her termination.

While Plaintiff may lack evidence to show that Warner was aware of her complaints, there is no dispute that Young, Braxton, and Moore had knowledge of Plaintiff's protected activity.  These individuals evaluated Plaintiff's performance and/or recommended the adverse actions against Plaintiff on which Warner relied.  *See Cobbins, supra*.  The fact that Defendants may have disciplined Albert in response to Plaintiff's complaint is not relevant, particularly as Plaintiff also raised concerns about Young's treatment of her in the same complaint and this was never addressed by Defendants.

Finally, to establish a causal connection, Plaintiff need only present "'sufficient evidence to raise the inference that her protected activity was the likely reason for the adverse action'"  *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997) (quoting *Zanders Nat'l R.R. Passenger Corp.*, 898 F.2d 1127, 1135 (6th Cir. 1990) (additional quotation marks and citation omitted)).  Evidence that an adverse employment action was taken shortly after a plaintiff exercised his or her protected rights is relevant. *Smith v. City of Salem, Ohio*, 378 F.3d 566, 570-71 (6th Cir. 2004) (citing *Nguyen v. City*

*of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000)); *see also Singfield v. Akron Metro. Housing Auth.*, 389 F.3d 555, 563 (6th Cir. 2004) (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727 (9th Cir. 1986) ("Causation sufficient to establish a prima facie case of unlawful retaliation may be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge.") In the present case, Plaintiff establishes that the adverse actions taken against her followed close behind her complaints of discrimination and harassment.  (*See* Pl.'s Resp. Br. at 18-19.)  Moreover, as established earlier, there is a genuine issue of material fact as to whether Defendants' asserted reasons for terminating Plaintiff were pretextual.  *Upshaw v. Ford Motor Co.*, 576 F3d 576, 590 (6th Cir. 2009) (finding that a jury could conclude that the defendants' proffered non-discriminatory reason for terminating the plaintiff were contrived in retaliation for the plaintiff's protected conduct).

For these reasons, the Court concludes that Defendants are not entitled to summary judgment with respect to Plaintiff's retaliation claims.

### C.    Plaintiff's Procedural Due Process Claim

Plaintiff alleges that Defendants violated her due process rights when they terminated her without affording her a pre-termination hearing or an opportunity to respond to the grounds for her termination.  Defendants contend that they are entitled to summary judgment with respect to this claim because Plaintiff was provided with a pre-termination disciplinary hearing, was provided notice of the work rule violations alleged, and was allowed to attend the hearing with her union representative and present evidence

26

to rebut the allegations.  Defendants argue that nothing more was required under the Supreme Court's decision in *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 105 S. Ct. 1487 (1985).[3]

Plaintiff points out, however, that she requested an adjournment of the final Disciplinary Conference because she had been placed on medical leave by her physician. Her request was denied and Braxton "conducted" the hearing in Plaintiff's absence. Furthermore, Braxton was the individual assigned to conduct the Disciplinary Conferences in Plaintiff's case; yet Plaintiff presents evidence to create a genuine issue of material fact as to whether Braxton was an impartial decisionmaker.  Braxton herself rated Plaintiff as unsatisfactory and Plaintiff's rebuttal to those ratings included her claim that Braxton had not adequately trained or supervised her.  (*See* Pl.'s Resp. Exs. 19, 28.) Further suggesting Braxton's lack of impartiality is the fact that she suppressed Wilson's positive review of Plaintiff when the final decision was made as to whether to terminate Plaintiff.  "[D]ue process requires an impartial decisionmaker before final deprivation of a property interest."  *McDaniels v. Flick*, 59 F.3d 446, 459 (3d Cir. 1995) (citing *Schweiker v. McClure*, 456 U.S. 188, 195, 102 S. Ct. 1665, 1670 (1982)).

For these reasons, the Court concludes that Defendants are not entitled to summary judgment with respect to Plaintiff's claim that they violated her due process rights.

---

[3]Defendants apparently agree that Plaintiff possessed a liberty interest in her continued employment which mandated the pre- and post-deprivation requirements of *Loudermill*.

**IV.    Conclusion**

Based on the above analysis, this Court finds a genuine issue of material with respect to whether Defendants' discipline and ultimate termination of Plaintiff constituted discrimination based upon her race, gender, and/or national origin discrimination and/or was in retaliation for Plaintiff's protected conduct.  The Court also finds a genuine issue of material fact in regards to whether Defendants violated Plaintiff's due process rights when she was terminated.

Accordingly,

**IT IS ORDERED**, that Defendants' motion for summary judgment is **DENIED**.


s/PATRICK J. DUGGAN
UNITED STATES DISTRICT JUDGE

Copies to:
Kathleen L. Bogas, Esq.
Charlotte Croson, Esq.
Jeanmarie Miller, Esq.
Steven M. Cabadas, Esq.